## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF ARKANSAS
## HARRISON DIVISION

**IN RE: EDWARD D. SVETC, Debtor**                    **No. 3:12-bk-71500**
                                                                          **Ch. 7**

**JACOWAY**                                                       **PLAINTIFF**

**v.**                              **3:12-ap-7095**

**EDWARD D. SVETC et al.**                             **DEFENDANTS**

**JACOWAY**                                                       **PLAINTIFF**

**v.**                              **3:12-ap-7141**

**EDWARD D. SVETC**                                      **DEFENDANT**


### ORDER AND OPINION DENYING DEBTOR'S DISCHARGE,
### AVOIDING FRAUDULENT TRANSFERS, AND SUSTAINING
### OBJECTIONS TO EXEMPTIONS

Before the Court are two adversary proceedings (3:12-ap-7095 and 3:12-ap-7141) and an
objection and amended objection to the debtor's exemptions.  All matters before the
Court were filed by chapter 7 trustee Jill R. Jacoway [the trustee].  On August 6, 2012,
the trustee filed adversary proceeding 3:12-ap-7095, alleging that the debtor fraudulently
transferred property before and after filing bankruptcy on April 13, 2012, and seeking
turnover of the transferred property pursuant to the Arkansas Uniform Fraudulent
Transfer Act and 11 U.S.C. §§ 542, 544(b), 548(a)(1)(A), and 550.  On August 13, 2012,
the trustee filed an amended complaint.  Edward D. Svetc [the debtor] and Jason
Thorgesen [Thorgesen] filed their respective answers on November 9, 2012.[1]  On
December 21, 2012, the trustee filed her second adversary proceeding, 3:12-ap-7141,

---

[1]  On March 5, 2014, Thorgesen reached a settlement with the trustee that was
subsequently approved by the Court on April 1, 2014.  As part of the settlement,
Thorgesen executed a quitclaim deed transferring his interest in the Lake Park Loop
property to the trustee.

objecting to the debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(4), and (a)(5).  The debtor filed his answer on January 16, 2013.  On October 29, 2012, the trustee objected to the debtor's exemptions.  On December 21, 2012, the debtor filed a response.  The same day, the trustee amended her objection to the debtor's exemptions.  The debtor filed his response to the trustee's amended objection on June 12, 2013.  On January 7, 2013, upon the trustee's motion, the Court consolidated the two adversary proceedings and the objections to exemptions for purposes of trial.  On March 11, 2014, the Court held a trial on the consolidated matters.  The trustee appeared personally and through her attorney, Bianca M. Rucker; creditor Nadine Svetc appeared through her attorney, Catherine F. Golden; and the debtor and Thorgesen appeared pro se.[2]  At the conclusion of the trial, the Court took the matters under advisement.  For the reasons stated below, the Court sustains the trustee's objections to the debtor's exemptions, avoids the debtor's fraudulent transfers as requested in 3:12-ap-7095, and denies the debtor's chapter 7 discharge as requested in 3:12-ap-7141.

## Jurisdiction

The Court has jurisdiction over these matters under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and they are core proceedings under 28 U.S.C. § 157(b)(2)(B), (E), (F), (H), and (J).  This order contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy 7052.

## Background

The debtor is an educated former business owner and certified public accountant [CPA]

---

[2]  Prior to July 12, 2013, attorney Teresa Olson represented the debtor in 3:12-bk-71500, while attorney David Ethredge represented the debtor and Thorgesen in 3:12-ap-7095 and the debtor (as the only defendant in that case) in 3:12-ap-7141.  On July 12, 2013, the Court entered an order granting Olson's and Ethredge's respective motions to withdraw from their representation of the debtor and Thorgesen.  On July 24, 2013, the Court continued the previously scheduled trial date to allow the debtor and Thorgesen time to obtain new counsel.  Neither the debtor nor Thorgesen obtained counsel and, after July 12, 2013, they have represented themselves in the matters now before the Court.

2

who is physically unwell but mentally intact and intelligent.[3]  On May 4, 2009, the debtor

and his wife, Nadine Svetc, divorced in Minnesota.  On June 5, 2009, the Minnesota state

court that had entered the parties' divorce decree entered an order reallocating the

parties' marital assets and granting Nadine Svetc a judgment against the debtor for

attorneys fees and costs.  The Minnesota court's June 5 order (referencing the debtor as

Respondent and Nadine Svetc as Petitioner) stated, in part:

> Respondent, in anticipation of this proceeding, and subsequent to the
> commencement of this proceeding, did everything he could to divest his
> spouse of 46 years from receiving her fair share of the marital estate.  In
> anger at her, even though he testified that he will not live longer than a
> few months, he attempted to make sure that she would have little to
> support her in her later years.  He refused to obey court orders.  He was
> defiant of instructions given to him by the Court during trial.  He accessed
> assets, hid them or otherwise disposed of them against Petitioner's
> interest.  He did not provide full disclosure of assets.  He manipulated
> TCF Bank and withdrew all of the remaining line of credit although he
> knew, fully well, that any withdrawal required dual signatures.  Although
> he refused to pay spousal support or provide Petitioner with sufficient
> funds from his retirement income to live, he spent money on eating out,
> unnecessary purchases, and on his own needs and comforts, totally
> disregarding the needs of his spouse.
>
> The day prior to trial, he withdrew over $100,000 from his IRA, lied about
> it in testimony on numerous occasions, allowed Petitioner to spend even
> more in attorneys fees to try and recoup the funds based on his lies, and
> then succeeded to spend the only remaining liquid asset paying his own
> expenses, paying his business partner for unconfirmed expenses, and
> prepaying his living expenses.  He admitted that he secreted some of these
> funds in a "phantom" bank account.  Respondent attempted to make a
> mockery of the legal process and relied on his ill health to protect him

---

[3]  The debtor testified that he holds a Bachelor of Science and Business
Administration (BSBA) degree from Creighton University in Omaha, Nebraska with a
major in accounting and minors in both economics and philosophy.  He also testified that
he has owned several businesses.  Attorney Norman Wilber testified credibly at the
March 11 trial that the debtor was "very lucid" and "very much in charge" when Wilber
represented the debtor in the months prior to the debtor filing his bankruptcy case on
April 13, 2012, and further testified that the debtor is a "very intelligent man."  Hr'g Tr.,
158, Mar. 11, 2014.  Nadine Svetc testified in her telephonic deposition on June 28,
2013, that the debtor is intelligent and "a very smart man."  Trustee's Ex. L. 6.

from any consequences.  His behavior was reprehensible.

The events surrounding Respondent's withdrawal of the IRA funds highlighted for this Court how intent Respondent is at taking all steps to ensure that Petitioner receives as little as possible from the marital estate. Respondent, who claimed serious health concerns, spent an entire evening traversing the city in his efforts to spend $100,000 so that Petitioner will have no possible access to these funds.

Trustee's Ex. 1.E.  In addition to cashing out his IRA and exhausting the parties' home equity line of credit without Nadine Svetc's required signature, the debtor changed his life insurance beneficiary from Nadine Svetc to Jeffrey Wendt (his employee of 15 years) and sold his CPA business (valued at $91,000.00) to Wendt for $1.00 on the evening prior to the commencement of the divorce trial.  As a result of the debtor's unauthorized asset disposal on the eve of his divorce trial, the Minnesota court awarded Nadine Svetc the parties' homestead and a second Minnesota property owned by the debtor consisting of vacant land.  The Minnesota court ordered Nadine Svetc to sell the two Minnesota properties and retain the proceeds from both sales for her future support.  The Minnesota court reserved jurisdiction to consider awarding Nadine Svetc additional spousal support after the properties were sold and the net proceeds were certain.  The Minnesota court also ordered the debtor to pay Nadine Svetc's outstanding attorney fees and costs because of his misconduct throughout the trial and because Nadine Svetc was financially incapable of paying her own fees and costs.  The Minnesota court entered judgment against the debtor in the amount of $81,604.00.[4]

Approximately two months later, the debtor entered into a real estate contract to purchase a residence located at 312 Lake Park Loop in Mountain Home, Arkansas [Lake Park Loop property].  The debtor paid for all necessary property inspections and appraisals. The debtor's name appears on the closing statement prepared by attorney Mark Carney

---

[4]  The debtor unsuccessfully appealed the Minnesota court's June 5 order.

4

(the closing agent that represented the seller of the Lake Park Loop property).[5]  On August 15, 2009, the debtor tendered two cashier's checks totaling $152,298.20 to the Carney Law Firm to fund the purchase of the Lake Park Loop property.  However, pursuant to the debtor's eleventh hour instructions to Carney, the deed to the Lake Park Loop property was not placed in the debtor's name, but instead was titled in the names of his longtime friends, Kenneth and Sherry Eckstrom [the Eckstroms].[6]  On August 17, 2009–before the Eckstroms became the record title-holders of the Lake Park Loop property–the Eckstroms executed a quitclaim deed transferring the Lake Park Loop property to a trust named the Edward D. Svetc Trust.  The next day, on August 18, 2009, the seller executed the deed transferring the Lake Park Loop property to the Eckstroms.  On August 25, 2009, the deed conveying the Lake Park Loop property from the seller to the Eckstroms was filed of record.  The deed conveying the property from the Eckstroms to the debtor's trust was not recorded.

Within days of the debtor funding the purchase of the Lake Park Loop property, Nadine Svetc took possession of the Minnesota home that she had previously shared with the debtor.  Despite the Minnesota court ordering the debtor to vacate the home by June 14,

---

[5]  On October 30, 2013, the Court held a hearing on the trustee's motion for a pretrial determination that the attorney client privilege would not preclude attorneys Teresa Olson, Norman Wilber, Mark Carney, and Emily Reed from testifying and producing documents in this matter that would otherwise potentially be protected by the privilege.  The trustee argued that the attorney-client privilege did not exist between the debtor and Carney or Reed because neither Carney nor Reed had represented the debtor.  The trustee argued that the debtor had waived his entitlement to the attorney-client privilege as to his communications with Olson and Wilber because the debtor planned to use their advice as a defense in these proceedings.  At the October 30 hearing, the debtor (and Thorgesen, to the extent that he believed that any of these attorneys had advised him) explicitly waived the attorney-client privilege as to these four attorneys.  On October 31, 2013, the Court entered an order finding that the debtor and Thorgesen were not entitled to assert the attorney-client privilege in this matter as to Olson, Wilber, Carney, or Reed.

[6]  The trustee named Kenneth Eckstrom and Sherry Eckstrom as defendants in 3:12-ap-7095; the Eckstroms settled with the trustee on February 8, 2013.

2009, Nadine Svetc saw the debtor and some of his associates moving items out of the home on August 19, 2009.  Trustee's Ex. L. 7.  Later that day, she entered the home and discovered and copied documents left behind by the debtor that indicated that he had failed to disclose (or had substantially undervalued) assets totaling $361,000.00 during the parties' divorce.  The documents that Nadine Svetc found at the home included copies of cashier's checks and contracts relating to the debtor's purchase of the Lake Park Loop property.  Trustee's Ex. L. 7.  On August 24, 2009, and again on August 27, 2009, Nadine Svetc filed police reports because the lock on a service door to the Minnesota home had been broken and the home was in disarray.  Many of the documents that she had discovered relating to the debtor's hidden assets were missing after August 24, 2009.  Additional documents and items were missing after August 27, 2009.[7]

Nadine Svetc's divorce attorney deposed Kenneth Eckstrom on December 7, 2009.  Eckstrom testified in his deposition that he had agreed to let the debtor put the Lake Park Loop property in his and his wife's names to "help him out" because "[the debtor] said the sheriff was going to throw him out [of his Minnesota residence] because of the divorce."  Trustee's Ex. L. 7.  Eckstrom testified that he "didn't want to know why [the debtor] wanted it in my name.  I believe he wanted me to do this as a friend."  Eckstrom also testified that he had known the debtor for 30 years and had learned "not to ask" the debtor's motivations.  Trustee's Ex. L. 7.  On May 3, 2010, Nadine Svetc filed a motion to reopen the Minnesota divorce case based upon the debtor's alleged fraud.  On July 15, 2010, the Minnesota court granted Nadine Svetc's motion to reopen and scheduled a pretrial hearing for September 28, 2010.  The debtor appeared at the September 28 pretrial hearing by telephone, and argued to the Minnesota court that the Lake Park Loop property was not marital property because he had purchased it with non-marital funds derived from liquidation of assets awarded to him in the divorce and inherited upon his

---

[7] The police report dated August 24, 2009, reflects that when police arrived at the home, the debtor was inside and admitted that he broke the lock.  The police report reflects that he told the police that he did so upon the advice of his attorney.  Trustee's Ex. L. 7.

brother's death.  On December 7, 2010, the Minnesota court entered a written order memorializing its findings from the September 28 hearing and stated that while the debtor, at least theoretically, may have been correct that the Lake Park Loop property was purchased with non-marital funds, it "may well become subject to a judgment in favor of [Nadine Svetc] to secure her interest in her share of the marital estate." Trustee's Ex. G.  In its December 7 order, the Minnesota court notified the parties of an evidentiary hearing that the court had scheduled for March 7, 2011, for the purpose of valuing and redistributing the assets that the debtor had omitted or undervalued in the divorce proceedings.

On March 1, 2011–less than one week before the scheduled March 7 Minnesota hearing–the debtor consulted attorney Norman Wilber.  During the March 1 meeting, the debtor discussed his Minnesota divorce proceedings at length and expressed his disagreement with the court's order requiring him to pay his ex-wife's attorneys fees.  In response to a pointed question by Wilber, the debtor stated that he had no knowledge of Nadine Svetc registering her Minnesota judgment in Arkansas.  The debtor also told Wilber that he had in his possession an unrecorded quitclaim deed to the Lake Park Loop property from the Eckstroms and that he could obtain title to the property at any time should the need arise.  On March 7, 2011, the Minnesota court held the evidentiary hearing to determine the value of the debtor's previously undisclosed and undervalued assets and took the matter under advisement.  On April 27, 2011, Thorgesen, the debtor's then-caregiver, contacted Wilber to advise him that the debtor had been hospitalized and that the debtor wished to make immediate changes to the deeds to the Lake Park Loop property.[8]  On April 27, Wilber drafted a deed transferring the Lake Park Loop property from the Eckstroms to Thorgesen.  On May 2, 2011, the Minnesota court issued its findings from the March 7 evidentiary hearing.  The court found that the debtor had purchased the Lake Park Loop property with liquid assets that he had not disclosed in the

---

[8] Thorgesen told Wilber that the debtor's ailments were physical, not mental and that the debtor was competent.

7

course of the divorce proceedings.  The Minnesota court also found that none of the assets omitted by the debtor were, at that point, readily available to the court for division. As a result, the Minnesota court granted Nadine Svetc judgment against the debtor for an additional $91,482.00 and, pursuant to its continuing in personam jurisdiction over the debtor, ordered the debtor to transfer the Lake Park Loop property to Nadine Svetc so that she could arrange for the sale of the property.[9]  The Minnesota court ordered that after expenses from the sale were paid Nadine Svetc was entitled to one half of the sale proceeds from the Lake Park Loop property, plus, from the other one half of the proceeds an additional $124,159.17 for attorney fees and costs (including the previous fees and costs that the court had ordered the debtor to pay).  If any proceeds remained after the court-prioritized distributions, they were to be distributed to the debtor.  Trustee's Ex. 1.H.

On June 11, 2011, the Eckstroms executed the deed that Wilber had drafted on April 27, 2011, transferring the Lake Park Loop property to Thorgesen.  On July 20, 2011, Thorgesen executed a quitclaim deed (also drafted by Wilber at the debtor's direction) transferring two-thirds of his interest to Wendt (the employee who had purchased the debtor's CPA business and replaced Nadine Svetc as the debtor's life insurance beneficiary the night before the divorce trial began).  The debtor instructed the parties to record the deed from Thorgesen to Wendt only upon his death.[10]  Also at the debtor's behest, Wilber drafted a deed transferring the Lake Park Loop property from Thorgesen to the debtor.  The debtor instructed Wilber not to record the deed from Thorgesen to the debtor but to retain it in the debtor's file at Wilber's law firm.

---

[9]  The Minnesota court found that the Lake Park Loop property was ultimately titled in the debtor's name.  Although the record is unclear on this issue, the Minnesota court's finding was ostensibly based upon the existence of the unrecorded quitclaim deed transferring the Lake Park Loop property from the Eckstroms to the debtor's trust.

[10]  Wendt executed a quitclaim deed transferring his interest in the Lake Park Loop property to the trustee prior to the March 11 trial in this Court.

On December 30, 2011, Nadine Svetc registered her Minnesota judgment in Arkansas. Four months later, on April 13, 2012, the debtor–assisted by Olson–filed this chapter 7 bankruptcy case. The debtor also stated in his statement of financial affairs that in "approximately October of 2010," the debtor had transferred to Carney Law Firm

> approx. $152,000 received for Debtor's share of property owned in Florida, used to assist creditors in purchase of home, in consideration for debts owed,, and a place for Debtor to live after he had been told he was terminally ill.

Trustee's Ex. K. The debtor did not disclose an interest in the Lake Park Loop property or any other real estate. The debtor also did not disclose ownership of or an interest in furniture, computer equipment, books, pictures, art, clothing, or insurance claims. The debtor disclosed that he had one bank account (a checking account) with a balance of $68.88 on the date of filing. On May 14, 2012, the trustee conducted the debtor's 341(a) meeting of creditors and, at the conclusion of the meeting, told the debtor that she believed that the transaction involving the Lake Park Loop property was a fraudulent transfer. On May 15, 2012, the trustee filed her notice of assets. On August 6, 2012, the trustee filed her adversary proceeding seeking to set aside the debtor's alleged fraudulent transfers of the Lake Park Loop property. The next day, the debtor amended his schedules to reflect his life estate in the Lake Park Loop property and to claim an exemption of "unknown value" in the property. The debtor also disclosed for the first time (and claimed as exempt) his ownership of $950.00 in furniture; $125.00 in books, pictures, and art; $300.00 in clothing; and a pending insurance claim for $20,965.00 (he claimed only $11,006.12 of the insurance claim as exempt).

On October 24, 2012, the trustee conducted an examination of the debtor pursuant to Federal Rule of Bankruptcy Procedure 2004 [the 2004 exam]. At the 2004 exam, the debtor disclosed for the first time that he owned a computer that was not reflected on his original or amended schedules. The trustee also discovered that the balance in the debtor's checking account on the date of filing was $2277.55, not $68.88 as he had stated in his schedules, and that the debtor had a second bank account (a savings account) that

9

he had not listed in his original or amended schedules.  During the 2004 exam, the debtor testified that since his divorce in 2009, he had compiled detailed records relating to his divorce and bankruptcy that he maintained in notebooks.  In response to the trustee's subsequent discovery requests, the debtor stated a second time that he had "over seventy notebooks or three ring binders regarding my divorce, bankruptcy, health, Florida property and Arkansas property."  Because the documents were voluminous, the debtor did not produce copies of the documents to the trustee, but instead agreed to allow the trustee access to the documents to perform an inspection.  Although the trustee contacted the debtor's former counsel to arrange for inspection of the documents, the trustee was not granted access to them.  The debtor testified at trial that subsequent to the 2004 exam, he burned the notebooks.  He claimed that he did not remember telling the trustee that she could inspect them.  The trustee subsequently filed her second adversary proceeding objecting to the debtor's discharge and objected to the debtor's exemptions.

## Summary of Trustee's Argument and Debtor's Response

The trustee alleges in her adversary proceedings and objections to exemptions that the debtor fraudulently transferred and concealed his true interest in the Lake Park Loop property by titling the property in the Eckstroms' (and later, Thorgesen's) names in order to place it beyond his creditors' reach.  The trustee argues that the transfers should be avoided and the property returned to the estate under the Arkansas Fraudulent Transfer Act and pursuant to 11 U.S.C. § 542, § 544(b),§ 548(a)(1)(A), and § 550.  The trustee also contends that the debtor's fraudulent transfer and concealment of the Lake Park Loop property warrants the denial of the his discharge pursuant to § 727(a)(2)(A) and (B).  She also alleges the debtor's discharge should be denied pursuant to § 727(a)(3) because he concealed and destroyed documents demonstrating his true financial condition.  Further, the trustee argues that the debtor's discharge should be denied under § 727(a)(4) because the debtor made false oaths in his bankruptcy schedules and statements by omitting and mischaracterizing his interest in various assets and withholding from the trustee documents relating to his property or financial affairs including his 2011 tax returns and the notebooks concerning the debtor's divorce and

10

bankruptcy.  Finally, she argues that the debtor's discharge should be denied under § 727(a)(5) because the debtor has failed to satisfactorily explain the loss of his assets.

In response, the debtor argues that he was not attempting to hide or improperly transfer assets when he arranged to have the Lake Park Loop property titled in the Eckstroms' and Thorgesen's names.  The debtor contends that it was his terminal diagnosis–not the substantial judgments arising from his divorce–that prompted him to surreptitiously arrange transfers of the Lake Park Loop property.  The debtor claims that he titled the Lake Park Loop property in the Eckstroms' names to ensure that he had a place to live until he died while simultaneously planning for the disposition of the property upon his death.  The debtor testified that immediately before the closing of the Lake Park Loop property, he decided to buy the property for the Eckstroms instead of himself because he had known them for 30 years and Kenneth Eckstrom had performed various odd jobs for him over the years.  The thrust of the debtor's testimony was that he believed that it was the right thing to do to leave the Eckstroms the property as a form of compensation for Kenneth Eckstrom's past labor.  The debtor testified that he titled the property in the Eckstroms' names instead of his own to avoid the taxes and attorneys fees that would have accrued from probating his estate.  The debtor acknowledged at trial that an attorney in Minnesota had drafted a trust for him prior to his acquisition of the Lake Park Loop property in the Eckstroms' names.  The debtor did not dispute that titling the property in the name of the trust would have accomplished his alleged goal of avoiding probate costs. The debtor testified, however, that he could not have put the property in the name of the trust because he was physically unable to return to Minnesota to finalize the trust documents prior to the closing of the Lake Park Loop property.  The debtor also testified at trial (in contradiction to his assertion that it was impossible for him to go to Minnesota and finalize the trust prior to the closing date), that he had planned to put the property in his own name *until he went to Minnesota* a few days prior to the closing date and suddenly realized the advantages of titling the Lake Park Loop property in the

Eckstroms' names instead of his own.[11]  In an effort to explain why Carney drafted a quitclaim deed from the Eckstroms to an allegedly non-existent trust bearing his name, the debtor testified that Carney made a mistake when he named the trust as the transferee of the Lake Park Loop property on the quitclaim deed that the Eckstroms executed on August 17, 2009.  The debtor claims that he signed the deed in blind reliance on Carney's legal advice despite Carney's obvious error.[12]  The debtor argues that the Eckstroms instigated the second transfer of the property by calling the debtor and asking whether the debtor had someone in Arkansas–a caretaker, perhaps–to whom they could transfer the property to avoid being subjected to further legal bills as a result of their ownership of the property.

## Findings of Fact and Conclusions of Law

If the Court finds that the debtor engaged in the duplicity alleged by the trustee, the debtor faces two potential consequences under the bankruptcy code: the forfeiture of his interest in the Lake Park Loop property (and his other undisclosed assets) and the denial of his discharge.

---

[11]  In accord with one of the debtor's two opposing assertions, the Court finds that the debtor did, in fact, go to Minnesota within days of the closing date.  Carney testified that he mailed closing documents to the debtor at an address in Minnesota.  Nadine Svetc testified in her telephonic deposition that she discovered the debtor at their former Minnesota home on August 19, 2009.  A few days later, as a result of Nadine Svetc reporting the first break-in on August 24, 2009, the police department generated a report recapping a responding officer's questioning of the debtor inside the Minnesota home.

[12]  Although the debtor argued that Carney was his attorney and he relied on Carney's legal advice in the initial transfer of the Lake Park Loop property to the Eckstroms, Carney testified that he never represented the debtor in connection with the Lake Park Loop property, but only copied information provided by the debtor to a bill of sale well after the Lake Park Loop transaction had closed.  Carney's testimony that he did not represent the debtor is supported by a cover letter that the debtor mailed to Carney Law Firm and addressed "Attention Real Estate Closer" three days before the seller transferred the Lake Park Loop property to the Eckstroms.  Trustee's Ex. 7.

## I.        Forfeiture of the Lake Park Loop property

The trustee has alleged two distinct but related bases for divesting the debtor of his interest in the Lake Park Loop property for the benefit of his creditors: (1) the debtor's fraudulent transfers of the Lake Park Loop property prior to the debtor filing his bankruptcy petition on April 13, 2012; and (2) the debtor's belated bad-faith attempt to claim an exemption in the fraudulently transferred Lake Park Loop property (and other omitted assets) after the trustee revealed the debtor's attempted concealment.

### A.        Fraudulent transfers

The bankruptcy code defines a "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with–(i) property; or (ii) an interest in  property." 11 U.S.C. § 101(54)(D).  A trustee may avoid a debtor's transfer of property under 11 U.S.C. § 548 if the debtor made the transfer on or within two years before the date that the debtor filed bankruptcy if the debtor made the transfer "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . ,  indebted[.]" 11 U.S.C. § 548(a)(1)(A).  In addition to the trustee's avoidance powers under § 548, a trustee may also invoke state law–here, the Arkansas Uniform Fraudulent Transfer Act–to avoid a debtor's transfer of property that rightfully belongs to the estate.  11 U.S.C. § 544(b). Similar to § 548, the  Arkansas Fraudulent Transfer Act defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes the payment of money, release, lease, and creation of a lien or other encumbrance." Ark. Code. Ann. § 4-59-201(12).  The relevant subsection of the Arkansas Uniform Fraudulent Transfer Act provides that a transfer made by a debtor is fraudulent if the debtor made the transfer with the actual intent to hinder, delay, or defraud any creditor of the debtor.  Ark. Code Ann. § 4-59-204(a)(1).  Although § 548 affords the trustee the ability to avoid transfers made within two years of filing bankruptcy, the Arkansas statute allows the trustee three years from the date of the transfer to bring a cause of action under Arkansas Code section 4-59-204(a)(1).  Ark. Code. Ann. § 4-59-209(a).  Despite the one-year difference in the

look-back period, "[t]he Eighth Circuit has, on numerous occasions, referenced a congressional intent to bring the bankruptcy law of fraudulent transfers into conformity with the analogous state laws." *Luker v. Eubanks* (*In re Eubanks*), 444 B.R. 415, 422 n.6 (Bankr. E.D. Ark. 2010). "Considering the similarities in purpose and language, many courts have concluded that the [Uniform Fraudulent Transfer Act] and section 548 are *in pari materia*, and that the same analysis applies under both laws." *In re Sun Valley Prods, Inc.*, 328 B.R. 147, 155 (Bank. D.N.D. 2005). Therefore, the Court will address the trustee's causes of action under § 548 and the Arkansas Fraudulent Transfer Act (made applicable by § 544) together.

Both § 548 and the Arkansas Fraudulent Transfer Act provide that a fraudulent transfer may be indirect. Therefore, as an initial matter, the Court finds that the debtor transferred property to the Eckstroms on August 18, 2009, when he funded the purchase of the Lake Park Loop property but instructed the closing agent to title the property in the Eckstroms' names. Similarly, the Court finds that the debtor transferred the Lake Park Loop property a second time when he directed the Eckstroms to transfer the property to Thorgesen on June 11, 2011.[13] Based upon the dates of the transfers, the Court finds that the debtor transferred the Lake Park Loop property twice within the three years prior to the trustee filing her first adversary proceeding on August 6, 2012, and once within the year prior to the debtor filing his bankruptcy petition on April 13, 2012, placing the transfers within the time frames required by the Arkansas Fraudulent Transfer Act and § 548, respectively.[14] Thus, the debtor's intent is of paramount importance to the Court's determination of whether the transfers should be avoided as fraudulent.

---

[13] Because Thorgesen was holding the deed transferring two-thirds of his interest to Wendt until the debtor's death, the Court recognizes that the debtor planned–but did not consummate–a third transfer.

[14] In the debtor's cross examination of Olson (his bankruptcy attorney) at the March 11 trial, he admonished Olson for allegedly failing to advise him to wait four additional months to file his bankruptcy case because the three year statute of limitations for fraudulent transfers would have expired on August 25, 2009.

14

Because fraud is rarely admitted, "courts generally look to certain factors, or 'badges of fraud' to make a determination of whether fraudulent intent exists." *U.S. Fid. & Guar. Co. v. Hogan* (*In re Hogan*), 208 B.R. 459, 462 (Bankr. E.D. Ark. 1997). To determine whether the debtor had the requisite "actual intent to hinder, delay, or defraud" a creditor, both federal and Arkansas courts consider factors including:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

Ark. Code. Ann. § 4-59-204(b)(1)-(10); *see also In re Hogan*, 208 B.R. at 462 (citing numerous cases). All factors need not be present for the Court to find that the debtor had the requisite fraudulent intent. *Id.* "It is not the mere number of badges present which indicates fraud, but, rather, it is the 'confluence of several [which] can constitute conclusive evidence of an actual intent to defraud.'" *Id.* (quoting *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1354 (8th Cir. 1995)). For the reasons discussed below, the Court finds that several badges of fraud are present in this case.

First, the Court finds that despite its serpentine chain of title, the debtor continuously possessed and exercised uninterrupted control over the Lake Park Loop property since he funded the purchase of the property in the Eckstroms' names. Even prior to his purchase of the property, the debtor manifested a clear intent to be the sole party in possession of the property, beginning with his decision to buy property in Arkansas based upon his

enjoyment of numerous past fishing trips to the state.  After the debtor looked at 26 Arkansas properties, he chose the Lake Park Loop property without consulting the Eckstroms (except to call Kenneth Eckstrom after he had chosen the property to ask if he could title the property in the Eckstroms' names).  Despite the Eckstroms' alleged ownership of the Lake Park Loop property, the debtor testified that the Eckstroms never saw the property.  In fact, to the debtor's knowledge, the Eckstroms have never set foot in Arkansas.  Nonetheless, according to the debtor, the Eckstroms were the true owners of the property and he was little more than their transient lodger.  In an apparent attempt to minimize his involvement in the second transfer of the Lake Park Loop property (from the Eckstroms to Thorgesen), the debtor insisted at trial that it was not his idea for the Eckstroms to transfer the property to Thorgesen.  Instead, the debtor adamantly maintained that the Eckstroms instigated the transfer to Thorgesen.  The debtor failed to explain, however, why the Eckstroms (as the alleged true owners of the property) sought both his permission and the name of the debtor's preferred transferee when they wished to rid themselves of their own property.

After the transfer to Thorgesen, the debtor persevered in his possession and control of the property.  Although Thorgesen, as the debtor's caregiver, spent time at the Lake Park Loop property during the day, he testified and the debtor confirmed that Thorgesen never spent a night at the property.[15]  Thorgesen testified that he had no control over the Lake Park Loop property and that even after the property was titled in his name, he stored no belongings on the property and "every bit" of the work that he did on the property was at the debtor's direction.  Hr'g Tr., 193, Mar. 11, 2014.  The debtor testified that all of his belongings (and no one else's) are located at the Lake Park Loop property.  The debtor paid the taxes due on the Lake Park Loop property from 2009 through 2012 (no one has paid the taxes for the last two years).  It is evident that the debtor, and only the debtor,

---

[15]  In contradiction to the debtor's testimony that Thorgesen never spent a night at the Lake Park Loop property, the debtor included in an attachment to his schedule J (expenses) a monthly expenditure of $2573.00 for "24 hr" caretaker expenses.

has possessed, controlled, and maintained the Lake Park Loop property since he paid for the property in August 25, 2009.

Second, the Court finds that the debtor transferred the property in close temporal proximity to the stages of his Minnesota divorce litigation that resulted in the debtor incurring substantial debts.  The debtor initiated the first transfer of the Lake Park Loop property within two months of the Minnesota court granting his ex-wife a judgment against him for $81,604.00 in attorney fees and costs.  The debtor initiated the second transfer of the Lake Park Loop property after the Minnesota court had reopened his divorce case to value and redistribute the marital assets that he had hidden during earlier divorce proceedings.  On December 7, 2010, the Minnesota court specifically warned the debtor that the Lake Park Loop property "may well become subject to a judgment in favor of [Nadine Svetc]" after the March 7, 2011 evidentiary hearing.  Within two months of the Minnesota court's March 7, 2011 hearing, the debtor (through Thorgesen) contacted Wilber to commission the drafting of the deeds necessary to effectuate the debtor's second transfer of the Lake Park Loop property.  The month after the Minnesota court ordered the debtor to transfer the Lake Park Loop property to Nadine Svetc, the debtor finalized his second transfer of the Lake Park Loop property, this time to Thorgesen, despite the debtor's assertion that leaving the property to the Eckstroms upon his death was the right thing to do.  A few weeks after the second transfer of the Lake Park Loop property was complete, on July 20, 2011, the debtor procured Thorgesen's execution of a deed transferring two-thirds of Thorgesen's interest in the property to Wendt, and instructed Thorgesen to file the deed upon the debtor's death.[16]

--------

[16]  Thorgesen testified that he and the debtor were involved in an altercation on October 7, 2013, that resulted in the end of his employment with the debtor.  Thorgesen testified that an argument ensued when the debtor told Thorgesen that the debtor planned to arrange a transfer of the Lake Park Loop property from Thorgesen to Wendt. Thorgesen testified that he refused to comply with the debtor's directive without first obtaining the trustee's and Court's permission.  The debtor corroborated that he and Thorgesen had a serious argument, but recalled the argument occuring on October 9,

(continued...)

Third, the Court finds that the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset that the debtor transferred to the Eckstroms and Thorgesen.  Although the debtor testified that he owed the Eckstroms money for various odd jobs that they had performed for him over the years, Kenneth Eckstrom testified in his deposition that the debtor had compensated him for the jobs that Eckstrom had performed at or near the time Eckstrom did the work.  Trustee's Ex. L. 7. Eckstrom further testified in his deposition that he agreed to let the debtor put the Lake Park Loop property in his and his wife's names to "help him out" because "[h]e said the sheriff was going to throw him out [of his Minnesota residence] because of the divorce." Trustee's Ex. L. 7.  Eckstrom testified that he "didn't want to know why [the debtor] wanted it in my name.  I believe he wanted me to do this as a friend."  Eckstrom also testified that he had known the debtor for 30 years and had learned "not to ask" the debtor's motivations.  Trustee's Ex. L. 7.  Eckstrom's testimony makes it evident to the Court that the Eckstroms provided nothing to the debtor in connection with the Lake Park Loop property except permission to use their names on the title to his property.

Unlike the Eckstroms, Thorgesen was not the debtor's friend.  Thorgesen was the debtor's hired caregiver, on the debtor's "payroll," and had known the debtor for only two years when the debtor transferred the Lake Park Loop property to him on June 11, 2011. Thorgesen testified that the debtor told him that if Thorgesen agreed to take care of the debtor for the rest of the debtor's life, the debtor would give Thorgesen a third of the Lake Park Loop property.  There is no evidence before the Court that the debtor and Thorgesen were particularly close, that the debtor owed Thorgesen a debt that he was attempting to satisfy with an interest in the Lake Park Loop property, or that–in addition to paying Thorgesen a salary–the debtor had to give Thorgesen an interest in the Lake Park Loop property to ensure that Thorgesen would continue to care for the debtor until his death.  There is no evidence before the Court that Thorgesen agreed to perform duties

---

[16](...continued)
2013.

18

over and above those that he was already performing as the paid debtor's caregiver in exchange for a one-third interest in the Lake Park Loop property.

Fourth, the Court finds that the debtor transferred substantially all of his assets when he funded the purchase of the Lake Park Loop property, based upon the debtor's testimony that the money he used to fund the purchase of the Lake Park Loop property was "all the money there was."  Hr'g Tr., 18, Mar. 11, 2014.

Finally, the Court finds that the debtor concealed both the transfer of the Lake Park Loop property and his interest in the property by mischaracterizing the transfer in his statement of financial affairs and failing to disclose his interest in the property on his schedules.  In addition to these badges of fraud, the debtor testified at trial that his primary motivation for titling the property in the Eckstroms' names was to ensure that he had a place to live.  Implicit in the debtor's stated motivation is his acknowledgment that had the property been titled in his own name, he would not have been able to retain it.  For these reasons, the Court finds that the debtor transferred the Lake Park Loop property with the actual intent to hinder, delay, or defraud his creditors–in particular, Nadine Svetc.  Therefore, the Court grants the trustee the relief requested in adversary proceeding 3:12-ap-7095, and avoids the debtor's fraudulent transfers of the Lake Park Loop property.

### B.    Exemptions claimed in bad faith

Although courts generally allow a debtor to amend exemptions, a court may deny a debtor's proposed exemption if the debtor has acted in bad faith.  *Kaelin v. Bassett* (*In re Kaelin*), 308 F.3d 885, 888 (8th Cir. 2002) (citing *Martinson v. Michael* (*In re Michael*), 163 F.3d 526, 529 (9th Cir. 1998)).  If circumstances indicate that a debtor intentionally concealed an asset that he later seeks to exempt, the court may find bad faith sufficient to bar the exemption of that asset.  *See Lucius v. McLemore*, 741 F.2d 125, 127 (6th Cir. 1984).  Amendments filed after the falsity of the original documents has been discovered do not negate the fact that the debtor's original schedules and statements were inaccurate.  *Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*), 249 F.3d 380, 382-83 (5th Cir. 2001).

19

Courts determine whether a debtor has acted in bad faith by examining the totality of the circumstances. *In re Kaelin*, 308 F.3d at 889.

In the debtor's original schedules, he failed to disclose an interest in the Lake Park Loop property and several other assets (furnishings, clothing, a computer, a pending insurance claim in the amount of $20,965.00, a second bank account, and an additional $2208.67 in the bank account that he did disclose). On his statement of financial affairs, the debtor affirmatively mischaracterized almost every salient aspect of the Lake Park Loop transfer. The transfer occurred on August 25, 2009, yet the debtor's statement of financial affairs represents that the transfer occurred in "approximately October of 2010." The Minnesota court found that the debtor purchased the property with liquid assets that the debtor had hidden during his divorce. The debtor testified that he used funds realized from the liquidation of a business that the Minnesota court had awarded to him in the divorce, yet his statement of financial affairs represents that he obtained the $152,000.00 used to buy the property from the "[d]ebtor's share of property owned in Florida." The debtor admitted at trial that he did not use funds from the sale of property in Florida, yet he never amended his statement of financial affairs to reflect the true source of the funds. The debtor admitted at trial that no evidence exists of a debt owed to the Eckstroms. Kenneth Eckstrom testified in his deposition that he had already been compensated for the work he did for the debtor, yet the debtor's statement of financial affairs states that he funded the purchase of the property "in consideration for debts owed."

The debtor testified at trial that he was concerned about the way that his bankruptcy attorney, Olson, had worded the disclosure of the Lake Park Loop property on his statement of financial affairs and attempted to foist all responsibility for his failure to accurately disclose and exempt his interest in the property onto Olson. However, the debtor signed his schedules and statements under the penalty of perjury and testified at his 341(a) meeting that they were true and correct. Irrespective of whether he was represented by an attorney during his bankruptcy, the debtor had an independent duty to provide accurate information to the Court, the trustee, and his creditors. *Doeling v.*

20

*Trieloff* (*In re Trieloff*), No. 12-07012, 2012 WL 3201786, at \*13 (D.N.D. Aug. 2, 2012) (citing *In re Barrows*, 399 B.R. 506, 511 (Bankr. D. Minn. 2009)). The Court finds that the debtor's inaccurate representation of the Lake Park Loop transfer is a continuation of his exhaustive efforts to disguise his interest in that property.

In addition to the debtor's initial omission of his interest in the Lake Park Loop property and his mischaracterization of the circumstances surrounding its transfers, the Court finds the timing of the debtor's claimed exemptions suspect. The debtor made no amendments to his schedules for almost four months after he filed his case on April 13, 2012. However, within one day of the trustee filing her first adversary proceeding on August 6, 2012, the debtor filed amended schedules that disclosed and claimed as exempt several (but not all) of his previously undisclosed assets. The debtor failed to disclose in his original or amended schedules that he owned a computer despite testifying to owning one at his 2004 exam. Instead, he ineffectively argued at trial that the trustee would not be able to sell the computer for much money. *See In re Trieloff*, 2012 WL 3201786, at \*11 (a debtor's absolute duty to accurately disclose assets applies even to assets that the debtor believes to be worthless). The debtor also failed to include in his amended schedules the existence of a second bank account and the true balance in the one account that he did disclose.

Based upon the totality of circumstances, the Court finds that the debtor intentionally concealed his interest in the assets that he failed to disclose in his original and amended schedules: the computer, the second bank account, and the additional $2208.67 in his checking account. Although the debtor eventually disclosed some of the assets that he had omitted from his first set of schedules, e.g., the Lake Park Loop property, furniture, clothing, and the insurance claim, he made the disclosures only *after* the trustee had filed her first adversary proceeding. The debtor's initial concealment is not mitigated by his later amendment because the amendment was filed after the debtor knew that his concealment had been discovered by the trustee. The Court finds that the debtor claimed his August 7, 2012 exemptions in bad faith. Therefore, the Court sustains the trustee's

objections to the debtor's exemptions and disallows the debtor's exemptions in the assets that he disclosed for the first time on August 7, 2012.  The Court will next determine whether the debtor's conduct also warrants the denial of the his discharge.

## II.        Denial of the debtor's discharge

Denial of a discharge is a "harsh and drastic penalty."  *Korte v. U.S. Internal Revenue Serv*. (*In re Korte*), 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (quoting *American Bank v. Ireland* (*In re Ireland*), 49 B.R. 269, 271 n.1 (Bankr. W.D. Mo. 1985)).  Because the remedy dictated by § 727 is severe, the statute's provisions are "'strictly construed in favor of the debtor.'" *Id.* at 471 (quoting *Fox v. Schmit* (*In re Schmit*), 71 B.R. 587, 589-90 (Bankr. D. Minn. 1987)).  However, § 727 is also intended to "avoid the debtor's abuse of the Bankruptcy Code."  *In re Schmit*, 71 B.R. at 590.  In a denial of discharge case under § 727, the burden of proof is on the objecting party.  *In re Korte*, 262 B.R. at 471.  Therefore, the trustee must prove each element of § 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(4), or (a)(5) by a preponderance of the evidence in order for the Court to deny the debtor's discharge.

### A.        Sections 727(a)(2)(A) and (a)(2)(B)

Section 727(a)(2) provides that the court shall grant a debtor a discharge, unless–

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
>
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>> (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).  Section 727(a)(2) is fundamental to the concept that a debtor's chapter 7 discharge is granted upon the condition that he has disclosed all of his assets and made them available for distribution.  *Helena Chem. Co. v. Richmond* (*In re Richmond*), 429 B.R. 263, 302 (Bankr. E.D. Ark. 2010).  The party objecting to a

debtor's discharge under § 727(a)(2) has the burden of proving four elements by a
preponderance of the evidence–

> (1) that the act complained of was done within one year prior to the date the
> petition was filed, or after the date the petition was filed;

> (2) that the act was that of the debtor;

> (3) that it consisted of a transfer, removal, destruction, or concealment of the
> debtor's property, or, if the act occurred after the date the petition was filed, the
> property of the estate; and

> (4) that it was done with an intent to hinder, delay, or defraud either a creditor or
> an officer of the estate.

*See* 11 U.S.C. § 727(a)(2); *see also In re Korte*, 262 B.R. at 472.  Proof that a creditor or
the estate was harmed as a result of the debtor's act is not required under § 727.  *In re
Richmond*, 429 B.R. at 302 (citing *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998)).
Failing to list assets on bankruptcy schedules and statements is tantamount to an act of
concealment falling within the time frame required by either prong of § 727(a)(2).  *See
Fowler v. Weathers* (*In re Weathers*), No. 5:09-ap-7203, 2011 WL 3207950, at *3
(Bankr. W.D. Ark. July 21, 2011) (citing *Cobb v. Hadley* (*In re Hadley*), 70 B.R. 51, 53
(Bankr. D. Kan. 1987)).  It is generally acknowledged that "concealment is a continuing
act."  *Id.* (quoting *Peterson v. Hazen* (*In re Hazen*), 37 B.R. 329, 332 (Bankr. M.D. Fla.
1983)).  The trustee contends that debtor's discharge should be denied under § 727(a)(2)
because he fraudulently transferred and concealed property when he mischaracterized his
true interest in the Lake Park Loop property prior to filing his bankruptcy petition and
failed to disclose all of his assets when he filed his petition and schedules.  For the
reasons stated below, the Court finds that the trustee met her burden of proof under
§ 727(a)(2)(A) and (B).

The Court finds that the debtor transferred and concealed property within the one year
period prior to filing his bankruptcy petition and that he continued to conceal property
after he filed his petition, satisfying the first and third elements required under

§ 727(a)(2).  The debtor first transferred (and simultaneously concealed his interest in) the Lake Park Loop property on August 25, 2009, when he paid for the property but directed the closing agent to title the property in the Eckstroms' names.  Although the debtor's initial transfer and concealment of the property occurred outside of the one-year period preceding the filing of his bankruptcy petition on April 13, 2012, the debtor arranged a second transfer (and commensurate concealment) of the property within the relevant one-year period preceding the filing of his petition when he orchestrated the transfer of the property from the Eckstroms to Thorgesen on June 11, 2011–only ten months before he filed his bankruptcy petition on April 13, 2012.  The debtor continued to conceal his interest in the Lake Park Loop property when he filed his petition by mischaracterizing the circumstances surrounding the transfer and failing to disclose his interest in the property until after the trustee unearthed it, as discussed above in section I.B.

The Court also finds that it was the debtor that transferred and concealed the Lake Park Loop property (and other omitted and mischaracterized assets), satisfying the second element of § 727(a)(2).  As discussed at length in section I.A., the debtor planned and implemented every facet of the transfers and concealment of the Lake Park Loop property.  Although the debtor cast the Eckstroms, Thorgesen, Wendt, and various others in supporting roles and bit parts, the debtor was the director.  He orchestrated the drafting and execution of each recorded and unrecorded deed that effectuated the transfers and continued concealment of the Lake Park Loop property.  As discussed above in section I.A. (in the context of the debtor's fraudulent transfers and equally applicable to the required analysis under § 727), the Court finds that the debtor possessed the actual intent to hinder, delay, or defraud his creditors–specifically, Nadine Svetc–satisfying the fourth and final element required for a denial of discharge under §727(a)(2).  Therefore, the Court denies the debtor's discharge pursuant to §727(a)(2).

### B.    Section 727(a)(3) and (a)(4)(D)

Under § 727(a)(3), a court may deny a debtor's discharge when the debtor has

24

> concealed, destroyed, mutilated, falsified, or failed to keep or preserve any
> recorded information, including books, documents, records, and papers,
> from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of
> the circumstances of the case.

11 U.S.C. § 727(a)(3).  Similarly (but with an additional element of intent),

§ 727(a)(4)(D) provides for the denial of a discharge when a debtor has

> knowingly and fraudulently, in or in connection with the case . . . withheld
> from an officer of the estate entitled to possession under this title, any
> recorded information, including books, documents, records, and papers,
> relating to the debtor's property or financial affairs.

11 U.S.C.  § 727(a)(4)(D).  Pursuant to 11 U.S.C. § 521(e)(2)(A), the debtor had a duty to

provide to the trustee his 2011 federal tax returns seven days prior to his 341(a) meeting

on May 14, 2012.  The debtor, despite the trustee's repeated requests, has never done so.

He stated at trial that he did not know where his 2011 returns were located.  The Court

does not find the debtor's explanation credible.  He is a seasoned business owner, a CPA,

and a meticulous record keeper.  Additionally, the debtor testified at his 2004 exam that

he had "ten feet" of notebooks containing information pertaining to his divorce and

bankruptcy.  In discovery, the debtor agreed to let the trustee inspect those notebooks.

The trustee was not given access to the notebooks despite her attempt to schedule a time

for their inspection with Ethredge, the debtor's attorney in the adversary proceedings at

the time.  Although it is conceivable that Ethredge did not relay to the debtor that the

trustee was attempting to schedule the inspection, the debtor (who had invested years

compiling the notebooks containing detailed information pertaining to his divorce,

bankruptcy, and general financial condition) burned the notebooks after the trustee

discovered that they existed in the course of his 2004 exam.  The debtor justified his

post-2004 exam bonfire by testifying at trial "with me dying and stuff, I was trying to

burn all this stuff. . . .  I just didn't want other people going through it."  Hr'g Tr., 54,

Mar. 11, 2014.[17] The Court believes that the debtor did not want the trustee going through his records. The Court denies the debtor's discharge under the additional bases of § 727(a)(3) and (a)(4)(D).

### C.    Section 727(a)(4)(A)

Under § 727(a)(4)(A), a court shall grant a debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." 11 U.S.C. § 727(a)(4)(A). A creditor objecting to a debtor's discharge under § 727(a)(4)(A) has the burden of proving five elements by a preponderance of the evidence–

> (1) that the debtor made a statement under oath;
> (2) that the statement was false;
> (3) that the statement was made with fraudulent intent;
>
> (4) that the debtor knew the statement was false; and
> (5) that the statement related materially to the debtor's bankruptcy.

*In re Richmond*, 429 B.R. at 307. "The bankruptcy code, through § 727(a)(4)(A), 'requires nothing less than a full and complete disclosure of any and all apparent interests of any kind.'" *In re Weathers*, 2011 WL 3207950, at *6 (quoting *In re Korte*, 262 B.R. at 474). Section 727(a)(4)(A) promotes truthfulness in schedules and statements. *Daniel v. Boyd* (*In re Boyd*), 347 B.R. 349, 355 (Bankr. W.D. Ark. 2006). The implications of the disclosure and veracity requirements of the bankruptcy code reach beyond each individual case. "The failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole." *Nat'l Am. Ins. Co. v. Guajardo* (*In re Guajardo*), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997).

---

[17] Although the Court believes the debtor's testimony that he suffers from ill health, his medical difficulties do not justify his consistent attempts to rationalize his deceit and improper conduct.

26

As detailed in section I.B. above (in relation to the exemptions claimed by the debtor in bad faith) and in section II.A. (in the context of § 727(a)(2)), the Court finds that the debtor made false statements under oath by failing to list and properly characterize numerous assets and transfers that related materially to the debtor's bankruptcy and financial condition, that he did so with knowledge of the falsity of his statements, and that he possessed the requisite fraudulent intent. The debtor certified under penalty of perjury that the information contained in his schedules and statements was true and correct. Despite filing amended schedules after the trustee had exposed the lies contained in the debtor's original schedules and statements, the debtor opted not to include all of the omitted assets and chose not to file–at any point in these proceedings–complete and truthful schedules and statements disclosing all of his assets and reflecting the true source of the $152,000.00 that he used to fund the purchase of the Lake Park Loop property. At trial, the debtor did not contend that his bankruptcy petition was accurate; rather, he argued that the mistakes were not his fault and that the omitted assets were not valuable. As discussed above in section I.B., both of those defenses fail. The Court finds that the debtor made false oaths within the meaning of § 727(a)(4)(A), and also denies his discharge under § 727(a)(4)(A).

### D.    Section 727(a)(5)

Section 727(a)(5) provides for the denial of discharge when the debtor has "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Under this subsection, the code does not require that "'the Debtor's explanation be meritorious, or that the loss or other disposition of assets be proper; it only requires that the explanation satisfactorily account for the disposition.'" *Bailey v. Whitehead* (*In re Whitehead*), 483 B.R. 902, 910 (Bankr. E.D. Ark. 2012) (quoting *In re Sharp*, No. 3:07-ap-01241, 2008 WL 3539671, at *2 (Bankr. E.D. Ark. 2008)). In this case, as discussed throughout this opinion, the methods chosen by the debtor to dispose of his assets were fraudulent and improper, but the Court finds that the explanations themselves were satisfactory for purposes of § 727(a)(5) and does not base the denial of

the debtor's discharge on that subsection.

**Conclusion**

For the above stated reasons, the Court avoids the debtor's fraudulent transfers of the Lake Park Loop property and authorizes the trustee to record the deeds to the Lake Park Loop property obtained through her settlements with Thorgesen and Wendt.  The Court also sustains the trustee's objections to the debtor's exemptions as to the exemptions claimed by the debtor for the first time on August 7, 2012.  Finally, the Court denies the debtor's chapter 7 discharge.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:   05/12/2014

cc:     Bianca Rucker, attorney for trustee
        Jill R. Jacoway, chapter 7 trustee
        Catherine F. Golden, attorney for Nadine Svetc
        Edward D. Svetc, debtor
        Jason Thorgesen, defendant
        All interested parties

28